TOWN OF MONTCLAIR, A MUNICIPAL CORPORATION, PLAINTIFF-RESPONDENT, v. MILIVOY· S. STANOYE-VICH, DEFENDANT-APPELLANT.

Argued November 13, 1950—Reargued January 15, 1951—Decided. March 12, 1951.

Mr. *Samuel Allcorn, Jr.*, argued the cause for respondent (*Mr. Robert B. Shepard, Jr.*, attorney).

Mr. *Irving Morris* argued the cause for appellant (*Messrs. Robinson & Morris*, attorneys).

The opinion of the court was delivered by

CASE, J. This appeal, certified to us on our own motion, brings up a judgment of the Essex County Court which, on defendant's appeal from a judgment of conviction in the Municipal Court of the Town of Montclair, found the defendant guilty of violating section 28, par. (c) of the zoning ordinance of the Town of Montclair and imposed a fine of $100 and costs. On the appeal the defendant made demand for a trial by jury, which was denied.

Defendant was the owner, by deed of record, of the premises in question. He made application, as owner, to the Building Department of the Town of Montclair for a permit to construct a cement block garage 30 feet in width, 22 feet in depth and 10 feet in height. A permit issued accordingly. What defendant actually erected was a garage 30 feet 6 inches in width and 27 feet 9 inches in height, containing a second floor and above the second floor a loft floor. The zoning ordinance defines the height of a building with a sloping roof as the "vertical distance measured * * * from the curb level to a point one-half ($\frac{1}{2}$) the distance between the top of the plate and the highest point of the roof" so that, for the purposes of the litigation, the height of the garage was 20 feet 2 inches. The premises are within Zone R-3 as set up by the town zoning ordinance which, in its section 28(c), provided that "accessory buildings 15 feet in height or over shall be set back from any lot line not less than one-half

(½) the height thereof," a requirement which in this case called for a setback of ten feet one inch from the side and rear lines. The garage, although construction was halted short of absolute completion, was obviously in violation of the ordinance. On January 30, 1948, the town filed a complaint against the defendant upon which there was a conviction and a fine in the amount of $200, of which $150 was suspended on condition that the defendant apply to the Montclair Board of Adjustment for a variance. The defendant did make such an application, but the application was denied. Following the denial of the application, and after a further period of almost a year during which the defendant had failed to take any corrective action, the town again caused a complaint to be lodged and on this, too, obtained a conviction. The defendant retained the building with its objectionable features, whereupon a series of complaints were filed, one of which was prosecuted and resulted in the judgment now before us.

Defendant contends that the erection of the building and the retaining of it on the premises with its violative features is not a maintenance within the meaning of the statute; a point which we think needs no further attention than to say that it is not well made. He also contends that he really is a trustee in the ownership and in whatever maintenance there has been, and that, consequently, he may not be adjudged guilty in his individual capacity. This point also needs but little attention. Assuming the fact to be that, notwithstanding the deed lodges the title in him individually and the applications for permission to proceed under the ordinance were made by him individually, his relationship to the title is that of trustee, nevertheless he is individually responsible to the law for infractions by him of ordinances and statutes and is properly held thereto in his own person. He further alleges that the ordinance provisions are not reasonable as to him; and in this point, too, we find no merit.

The defendant further contends that "The ordinance to be enforced in the manner suggested by the municipality violates Article I, par. 12 of the New Jersey Constitution

and the Eighth Amendment of the United States Constitution." It appears to be appellant's contention that if he were found guilty of an offense for every day during which the violation has continued and were sentenced to the maximum permitted by the ordinance for each of those days, the fine would be excessive and the punishment cruel and unusual. But he has not been so found and he has not been so sentenced. *R. S.* 40:49–5 provides that a governing body may prescribe a penalty for the violation of ordinances it may have authority to pass either by imprisonment in the county jail or in any place provided by the municipality for the detention of prisoners for any term not exceeding 90 days, or by a fine not exceeding $200, or both. We are not called upon to determine the validity of the various sanctions which might be applied under the ordinance and the statute. *Independent Warehouses, Inc., v. Scheele,* 134 *N. J. L.* 133 (*E. & A.* 1945). The punishment actually imposed was not excessive in constitutional intendment.

The point which was deemed by us to be of sufficient importance to call for a reargument is that the defendant was entitled to a jury trial. The basis upon which that argument was advanced is that *R. S.* 2:225–18 provided that "every conviction for violating a town ordinance * * * with or without a jury trial, may be reviewed by appeal to the court of common pleas of the county in the same manner and upon the same terms as appeals are or may be taken from the small cause courts * * *," and *R. S.* 2:33–121 provided that appeals from the small cause courts "shall be heard and determined by the judge of the court of common pleas without a jury, unless a demand for a jury is made in writing * * *." Adding those statutory provisions to the New Jersey constitutional provision with relation to jury trials, appellant argues to substantially this effect: *R. S.* 2:225–18 was originally passed as sec. 2 of ch. 194, *P. L.* 1907, and was still in force at the adoption of the Constitution of 1947, which provides in Article I, par. 9, that "The right of trial by jury shall remain inviolate * * *"; therefore defendant was vested with the right, which it is beyond the province of the court

or Legislature to extinguish, to be awarded, on appeal, the jury trial for which he asked.

A similar provision was in Article XXII of our Constitution of 1776 in the following language: "* * * the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever." The 1844 Constitution, Article I, par. 7, provided: "The right of trial by jury shall remain inviolate * * *." Article I, par. 9 of the 1947 Constitution re-enacted the provision in that precise language. The right of trial by jury, which was thus confirmed and retained inviolate, is not and has never been a right which a defendant could invoke in all instances, even in charges of a criminal nature. It is and has been applicable only in those matters in which it existed anciently under the common law. Contemporaneous construction by legislative bodies, accepted as of course by the bar, the courts and the people generally, make this clear. The early compilations, reflecting the conception under the then current common law practices, contained many statutes setting up *qui tam* actions. Chapter XII of laws passed between 1682 and 1702 (*Leaming & Spicer, Grants and Concessions, p.* 240) made profane swearing an offense cognizable before a justice of the peace and punishable by fine, distress of goods and, on default, setting in the stocks of one over 12 years of age and whipping if under that age; and chap. XIII penalized drunkenness, and chap. XV, profaning the Lord's Day, likewise on trial before, and conviction by, a justice of the peace. *XII George Second* (1738-1739) *Allinson, pp.* 99-102 (continued by *XV George Second, Allinson, p.* 122), provided for the trial and punishment by two magistrates of persons charged and by them found guilty of larceny under the value of 20 shillings. In 1798, while the Constitution of 1776 was still a relatively new expression of fundamental law, a comprehensive vice and immorality act was passed authorizing justices of the peace to try, convict and punish by fines, or on default by sale of goods and chattels, and setting to the stocks or committing to jail (*Paterson, p.* 329) ; and in 1799 a disorderly persons act was passed providing for trial before a

justice of the peace, and, as punishment, sentence to the workhouse at hard labor for any time not exceeding three months (*Paterson, p.* 410). These statutes are selected at random for the purpose of demonstrating, by enactments either concurrent with the period in which the common law prevailed or passed during the period which immediately followed the first constitutional protection of right of trial by jury, that the right was not pertinent to every defendant on every charge.

The thread of appellant's argument is that each constitutional provision speaks anew as of the time of the adoption of the instrument of which it is part and includes such legislative provisions as are on the statute books at the time of the adoption, however recently theretofore the statutory provision had been passed. We find otherwise. The right of trial by jury protected in each of our Constitutions is the right as it existed at common law *and* remained on July 2, 1776. The provisions under study, as well as the command that no person shall be held to answer for a criminal offense unless on the presentment or indictment of a grand jury—*Article* I, *par.* 8 of the 1947 *Constitution* and *Article* I, *par.* 9 of its predecessor—alike have relation to the substance of the common law. Each succeeding Constitution undertook to preserve, inviolate, the right as it had originally existed and which the 1776 instrument ordained was to be "without repeal, forever."

Chief Justice Beasley, speaking for the Supreme Court in *State v. Doty,* 32 *N. J. L.* 403 (1868), said:

"The constitutional declaration is, that 'the right of a trial by jury shall remain inviolate,' and the effect of the clause is to establish the privilege by the highest of sanctions, but not to enlarge it. The provision operates as a restraint upon the legislative power; the right is not to be impaired or diminished, but is to remain as it existed at common law, and according to the practice of the courts anterior to the establishment of the fundamental law."

Thus our courts, 24 years after the adoption of the 1844 Constitution, stated that the subject of the bulwark was the right of trial by jury *as it existed at common law.* Again, Mr. Justice Trenchard, holding the opinion for the Court of Errors and Appeals in *State v. Rodgers,* 91 *N. J. L.* 212

(1917) (italics inserted), said: "No doubt the legislature has power to provide for the punishment of an offense which is disorderly conduct merely and not an offense *indictable at common law*, by summary proceedings without indictment and trial by jury. \* \* \* We think it quite clear that the thing prohibited in the Supplement of 1913 \* \* \* is not a public or common nuisance indictable at common law"; and to like effect throughout the opinion. So, too, Mr. Justice Parker, in the Supreme Court case of *Wilentz v. Calvin*, 125 *N. J. L.* 455 (1940), in determining compliance with the constitutional provision on jury trials, took as his guide whether the offenses were "of the character which constitutes offenses at the common law." Mr. Justice Minturn, in *Vega v. Sullivan*, 2 *N. J. Misc.* 385 (1924), said without hesitancy: "The rule is settled beyond cavil that it (trial by jury) is guaranteed only in those cases where it exists at common law." The unequivocal language of that decision emphasizes an earlier statement by the same writer in *Katz v. Eldridge*, 96 *N. J. L.* 382 (*Sup. Ct.* 1921):

"When we approach the authorities of this state upon the subject of indictment and jury trial, it becomes apparent that there is practically an entire unanimity of view. Indeed, learned counsel upon the argument conceded the rule to be that as to those offences which, at the time of the adoption of our constitution of 1776, were triable without jury under the uniform practice of British law, the right of summary trial still persists, notwithstanding the constitutional guarantees of trial by jury, and the legislature may in its discretion deal with such cases in a summary manner."

(The finding that summary trial under the "Prohibition Enforcement Act" did not violate either section 7 or section 9, Article I, of the 1844 Constitution was sustained by the Court of Errors and Appeals, 97 *N. J. L.* 123, 157.)

Mr. Justice Depue in *McGear, et al. v. Woodruff*, 33 *N. J. L.* 213 (*Sup. Ct.* 1868), construing the 1776 and the 1844 provisions, and referring specifically to the seventh section of the first article of the 1844 Constitution, said:

"By that section it was not intended to introduce trial by jury in cases where it did not exist before, but merely to preserve it inviolate

in cases where it existed at the time of the adoption of the constitution. Prior to the adoption of the constitution of 1776, convictions before magistrates for petty criminal offences, and violations of police regulations were of frequent occurrence, and were recognized as part of the laws of England."

And the Supreme Court said in *Howe v. Treasurer of Plainfield,* 37 *N. J. L.* 145 (1874):

"It was held in the case of *McGear v. Woodruff,* 4 *Vroom* 213, that the constitutional provision above referred to was substantially the same as that upon the same subject contained in the Constitution of 1776, and that neither was intended to extend the right of trial by jury to cases to which it did not previously attach. In that case, as well as in the case of *Byers et al. v. The Commonwealth,* 42 *Pa. State R.* 89, it is clearly shown that prior to 1776, the legality of convictions before magistrates for petty offences and for violations of police regulations without trial by jury, was unquestioned. In the latter case, Justice Strong, delivering the opinion of the court, says: 'It is the old right, whatever it was, that we previously enjoyed that must remain inviolate alike in its mode of enjoyment and in its extent.' "

Mr. Justice Swayze in *Ex parte Newkosky,* 94 *N. J. L.* 314 (*Sup. Ct.* 1920), said that "The provisions of our state constitution as to indictment by a grand jury and trial by a traverse jury apply only to criminal cases and cases in which a trial by jury was had at common law." "Accusations of criminal conduct are tried at the common law by jury; and wherever the right to this trial is guaranteed by the Constitution without qualification or restriction, it must be understood as retained in all those cases which were triable by jury at the common law * * *. (Where a new offense is created by statute, if it belongs to a class of cases that is triable by jury, one accused of such offense will be entitled to a jury trial. But he will not be so entitled if the new offense does not belong to such a class. * * *)." *Cooley's Constitutional Limitations* (*8th ed.* 1927), *p.* 668. "The constitutional provisions do not extend the right; they only secure it in the cases in which it was a matter of right before." *Id., p.* 865.

Likewise the touchstone in determining whether an indictment is or is not constitutionally requisite is whether or not

the offense was one at common law. *State v. Anderson,* 40
*N. J. L.* 224 (*Sup. Ct.* 1878) ; *Riley v. Trenton,* 51 *N. J. L.*
498 (*Sup. Ct.* 1889). Art. I, § 8 of the 1844 Constitution
directing that in all criminal prosecutions the accused should
have the right to a speedy trial by an impartial jury conferred
no new right but only what was previously a common law
right. *State v. Fox,* 25 *N. J. L.* 566, 589 (*Sup. Ct.* 1856).
"The constitutional requirement that 'the right to a trial by
jury shall remain inviolate' guarantees the opportunity to sub-
mit common law rights to a tribunal that shall possess the
attributes of the historical jury as it existed at the time of the
adoption of the organic law." *Clayton v. Clark,* 55 *N. J. L.*
539 (*Sup. Ct.* 1893.). The exhaustive opinion written by Mr.
Justice Depue for the Court of Errors and Appeals in *Brown
v. State,* 62 *N. J. L.* 666 (1898) ; affirmed, 175 *U. S.* 172,
44 *L. Ed.* 119 (1899), leads inevitably to the conclusion that
the right of trial by a jury, as contrasted with various inci-
dents in the drawing and selecting of the jury, was the right
as it existed at common law at the adoption of the Constitu-
tion of 1776. That instrument "confirmed" the right, as it
then was, to remain, "without repeal, forever," and the two
succeeding documents ordained that the right, so consecrated,
should "remain inviolable"—the same right with repeated
assurances of perpetuation as to its fundamentals. *Cf. People
v. Bruner,* 343 *Ill.* 146, 175 *N. E.* 400 (1931).

Appellant confidently cites in support of his contention the
case of *McGinty v. Carter,* 48 *N. J. L.* 113 (*Sup. Ct.* 1886) ;
but an analysis of the decision lessens its force as a precedent
on the present issue. The gist of the reasoning in that case
involves an element not here present. The defendant, having
prevailed in a court of small causes where, under the 1776
Constitution, he was entitled to, and had, a jury trial, was
taken by the appeal of his adversary to the Court of Common
Pleas. A statute passed after the adoption of the 1776 Con-
stitution and before the adoption of the 1844 Constitution
but repealed after the adoption of the latter instrument,
granted, on such appeals, the right, on demand, to trial by
jury. The defendant demanded and was denied trial by jury

on the appeal and judgment went against him. To the extent that the Supreme Court decision depended on the proposition that the defendant's appeal to the Court of Common Pleas was from a judgment in a trial where he had of constitutional right a jury at whose hands he had prevailed it has no application here because the present appellant had no jury, and no right to a jury, in the municipal court; he was there tried, without objection, by the judge without a jury, and lost; and it was he who took the appeal. That this distinguishing element weighed heavily, if it did not actually control, in the decision of the *McGinty* case is apparent from the opinion:

"As this right of trial by jury had attached in cases of appeal where there has been a jury trial before the justice of the peace in the court for the trial of small causes, no legislation, after the adoption of the constitution of 1884 (*sic*), could deprive a party of that right, unless he assented by express waiver of this personal privilege secured to him. Such is the intimation given by this court in *Wanser v. Atkinson*, 14 *Vroom* 571, where, after collating the several acts relating to the trial by jury on appeals, and concluding that the language of the constitution does not require the legislature to furnish a trial by jury to suitors on appeal from justices' courts, where they have chosen to try their cause without a jury in the first instance, it carefully guards against any such conclusion where there has been a jury trial in the justices' court. It seems to be a wrong in this case, that the defendant, who has had a verdict of a jury in an action of tort in his favor, in the court for the trial of small causes, should, when the plaintiff brings him before another tribunal for a retrial of the facts, find a law confronting him which says he shall have no jury trial."

The opinion seems to treat the statutory right of trial by jury on appeal as an incident to the clear constitutional right of trial by jury in the first instance and in this respect is consistent with its earlier expression that the 1844 provision is substantially the same as the 1776 provision and that "neither was intended to extend the right of trial by jury to cases where it did not previously attach."

In *Wanser v. Atkinson*, 43 *N. J. L.* 571 (*Sup. Ct.* 1881), cited in the *McGinty* decision, two questions were decided; first, whether the express constitutional guarantee of a right to trial by jury embraced appeals from the small cause court where no jury had been demanded below; second, whether

the fact that the wrong was committed while the statute gave to the parties a right to jury trial on such appeals, placed this right beyond legislative power so far as related to that wrong. Both questions were answered in the 'negative and neither decision goes to our controversy; but the trend of the discussion on the first question led the court in the *McGinty* case to conclude that where a jury had of right been successfully availed of by the defendant in the first instance he should not, on appeal, be denied his demand for a jury, a situation which, as we have said, does not exist in the instant case.

██ Although the facts and the reasoning in the *McGinty* case are thus distinguishable, the decision does assume the inviolability against legislative repeal of a statute which did not go to a common law right and was not extant at the adoption of the 1776 Constitution but was on the books when the 1844 instrument became effective, and to the extent that such a theory is sought to be applied to a minor offense like the one now before us, not triable by jury at the common law, we are not in accord. Convictions before magistrates for small criminal offenses and penalties for offenses minor in character, unknown to the common law, were never within the scope of the right but are within the legislative power to impose and to terminate. *Cf. Peck v. Police Court of Fort Lee*, 137 *N. J. L.* 19 (*Sup. Ct.* 1948). As was said by Chief Justice Hornblower in *Johnson v. Barclay*, 16 *N. J. L.* 1, 6 (*Sup. Ct.* 1837), on the subject of a refusal by a justice of the peace to grant a trial by jury on a charge of profane swearing, "In doing so, the justice was right. Convictions before a justice were in practise in this state, long before the Constitution was formed—By the twenty-second article of that instrument, the trial by jury was to 'remain confirmed' as a part of the law of this (then) colony; but it was not introduced as a new mode of trial, in all cases—It was adopted, or rather continued, as it was then used in England and in this colony, and was not at that time, either there or here, resorted to in cases of summary proceedings and convictions for petty offences." *Cf. Roesel v. State*, 62 *N. J. L.* 216, 247 (*E. & A.*

1898). That has been the view not only of the courts but of competent textbook writers. 2 *Cooley's Blackstone* (1871), *page 385, Note 39*, said:

"So important has the right of trial by jury been regarded in the United States, that not only the national constitution, but the constitution of each of the states, contains limitations, more or less broad, upon the power of the legislature to deprive parties of it. * * * The restrictions in the state constitutions vary greatly, and they generally permit parties to waive the right. Some of them also allow a jury of less number than twelve. It is well settled, however, that where the constitution preserves the right of trial by jury in general terms, it preserves it for all those cases in which it was demandable of right at the common law. * * *;"

a statement repeated as Note 35 at page 221 of the third edition of the same work (1884). *Cf. Cooley's Constitutional Limitations, supra, pp.* 668-675.

*R. S.* 2 :225–18 was without constitutional protection. The Legislature had the authority to pass it, and did so. It also had the authority to repeal it, and the remaining question is whether it did that.

The major changes which were made in our fundamental law by the 1947 Constitution were not an effervescence of the moment; they were the result of years of crystallizing thought and selective processes. Among the subjects which with general acquiescence were considered deserving of emendation and modernization were our court system and the practice and procedure in the courts. There is no point in going into the details of that indisputable fact. One outstanding feature of the new Constitution was the enlargement of the power of the Supreme Court over practice and procedure, the extent and conclusiveness of which was lately declared in *Winberry v. Salisbury*, 5 *N. J.* 240 (1950). A further act of the Constitutional Convention was to enjoin the Legislature in what might be termed a moral mandate as follows:

"Now Therefore be it Resolved:
"(1) That the Legislature is hereby memoralized to consider the entire inferior court system of this State and to take such action as may be deemed necessary to establish a modern and efficient inferior court system to be presided over by qualified persons and to become

effective if at all possible by September 15, 1948, the date that the Judicial Article adopted by this Convention is to become effective. * * * ."

*Convention Proceedings, Constitutional Convention of* 1947, *volume* 1, *p.* 847. That, to be sure, was not a constitutional provision, but it was nevertheless a clear call upon the Legislature to perform the duty of modernizing and making efficacious a sprawling inferior court system, or combination of systems, which had grown into the condition of a confused labyrinth. The Legislature, in response—and in view of the preamble set out below there can be no doubt that the purpose was to coordinate the new legislation with the provisions of the Constitution and with the spirit which permeated the Convention—passed a series of statutes, *chapters* 264, 384 and 394, *P. L.* 1948 (*chs.* 264 and 394 are allocated as *R. S.* 2:8A–1 *et seq.* and *ch.* 384 is allocated as *R. S.* 2:8–37.1 *et seq.*), which created a single inferior court of original limited jurisdiction (the county district court) in civil cases and a single inferior court at the municipal level (the municipal court) with original limited jurisdiction over certain crimes, other statutory offenses and municipal ordinance violations. Chapter 264 was prefaced with this preamble:

"WHEREAS, The Constitution of 1947 provides for the vesting of judicial power in certain constitutional courts and further for the establishment, alteration or abolition by the Legislature of other courts of limited jurisdiction; and

WHEREAS, Such courts of limited jurisdiction should be so established, altered or abolished in the interest of a simplified and thoroughly competent administration of local justice for the good and convenience of the people of the State; and

WHEREAS, The Supreme Court established by the Constitution of 1947 is vested with power and responsibility to make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts, and the chief justice of that court, is constituted as the administrative head of all the courts in the State; and

WHEREAS, The mandate of the people so given, in the interest of establishing responsibility for the true administration of justice, requires implementation by legislation to eliminate the present

confusing, inefficient and frequently condemned system of local courts, and to create a simplified, modernized and acceptable structure and system of local courts; therefore,", etc.

The statute transferred (*sec.* 31) all causes pending in the local police, magistrates' and recorders' courts to the municipal court. It abolished (*sec.* 37) the office of justice of the peace and the small cause courts. (*Cf. State v. Yaccarino,* 3 *N. J.* 291 (1949)). It provided (*sec.* 30) that "the practice and procedure of the said municipal courts shall be substantially as provided by sections 2 :220–32 to 2 :220–55, both inclusive, of the Revised Statutes, subject to such rules as the Supreme Court shall promulgate and make applicable to the municipal courts which rules shall supersede (so far as they conflict with) statutory and common law regulations theretofore existing."

It is manifest from the preamble and from the body of the act that the legislation was intended to and did abolish all of the former inferior courts of limited civil and criminal jurisdiction at the local level and the confused practice and procedure pertaining to each, with the exception of the existing criminal judicial district courts, and in their place to establish a single court of limited civil jurisdiction in each county and a single court of limited criminal jurisdiction in each municipality with a uniform practice and procedure throughout.

The Supreme Court, accepting its function under the Constitution, and, as it believed, with the municipal field fully cleared, by legislative act, of statutory control, promulgated *Rule* 2 :11 (h) which provided generally that an appeal from inferior courts of limited criminal jurisdiction should operate as an application for a trial *de novo* without a jury, and the later *Rule* 8 :11–1 which specifically applied the practice to the local criminal courts.

We thus have many parts fitting into a single pattern; the Constitution itself with its wide sweep, the call by resolution from the Convention to the Legislature to make over the inferior court system to synchronize with the effective date of the Judicial Article, the preamble by the Legislature with its clear statement of purpose to create a simplified and mod-

ernized system of local courts in harmony with the broad rule-making power of the Supreme Court, the establishment of such a system, the abolition of existing inferior courts, and the direction that the practice and procedure in the new municipal courts should be substantially as provided by certain enumerated statutory sections (which do not contain the right or privilege for which appellant contends) but that even these sections should be subject to Supreme Court rules and that Supreme Court rules should prevail when they were in conflict with previously existing statutory or common law regulations; and, finally, the setting up of the new courts and the assumption by the Supreme Court of its rule-making power.

There was clearly an implied repealer of such statutes as the one relied upon by appellant. It is true that implied repealers are not favored in the law; but it is also true that a statute must be considered according to what appears to have been the intention of the Legislature; and when statutes relating to the same subject are repugnant or inconsistent, and the later statute is clearly intended to prescribe the only rule which should govern the· case provided for, it will be construed as repealing the earlier act. *State v. Corlese,* 104 *N. J. L.* 312, 315 (*E. & A.* 1927). The statutory language, read in the light of the circumstances which we have recounted, permits of no other conclusion than that the Legislature intended to effect a repeal of the statutory incidents to trial in and appeal from the courts to which it relates, retaining to the new municipal courts the substance, until replaced by rule, of so much of the practice and procedure of district courts as was contained in certain sections which do not bear on the disputed question. The court in which appellant was initially tried was one of the new municipal courts operating under the new practice and procedure.

We conclude that the Legislature repealed section 2 :225–18 and that it had constitutional authority so to do, and that, therefore, when appellant made his demand for a trial by jury on the appeal he was without either statutory or· constitutional ground. He was within the application of *Rules*

2:11(h) and 8:11-1, *supra,* and was properly put to trial *de novo* before the court without a jury.

The judgment below will be affirmed, with costs to the respondent.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.