267 N.J. Super. 305 (1993)
631 A.2d 564
SHIRLEY PHILLIPS, PLAINTIFF-APPELLANT,
v.
JOHN PHILLIPS, DEFENDANT, AND MARIE CARRIGAN AND EDWARD CARRIGAN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1993.
Decided October 7, 1993.
*307 Before Judges PETRELLA and CONLEY.
Tommie Ann Gibney argued the cause for appellant (Segal & Andres, attorneys; Kenneth G. Andres, Jr., of counsel; Ms. Gibney, on the brief).
George Prutting argued the cause for respondents (Fitchett & Prutting, attorneys; Cathy L. Brackin, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiff Shirley Phillips[1] filed suit for damages allegedly sustained due to injuries suffered in a motor vehicle accident involving defendants. On December 4, 1992, the motion judge granted defendants Marie and Edward Carrigan summary judgment on the ground that the verbal threshold provisions of N.J.S.A. 39:6A-8(a) precluded Phillips' suit.
On appeal,[2] Phillips argues that the motion judge erred in granting summary judgment because he did not comply with *308 Oswin v. Shaw, 129 N.J. 290, 609 A.2d 415 (1992), and also asserts that her medical documentation evinces a type six, seven or eight injury pursuant to N.J.S.A. 39:6A-8(a). Plaintiff additionally contends that she is entitled to a jury trial as to all fact issues and claims that the statute's verbal threshold does not prohibit all soft-tissue injuries. Alternatively, Phillips argues that the verbal threshold does not apply because the Carrigans are Pennsylvania residents, and that N.J.S.A. 39:6A-8 and 8.1 violate the due process and equal protection clauses of the United States and New Jersey Constitutions.
Phillips alleges that on August 6, 1989,[3] she was a passenger in an automobile operated by John Phillips in Salem, New Jersey that collided with an automobile[4] operated by Marie Carrigan and owned by Edward Carrigan. At the time of the accident Phillips was fifty-four years old. Phillips alleged that she sustained certain injuries as a result of this accident, for instance, X-rays taken immediately after the accident of the left leg revealed "some mild amount of soft tissue swelling.... [and] a small fleck of calcium ... which could represent a small avulsion injury."
On August 7, 1989, Phillips visited Dr. Urkowitz complaining of pain in her left leg and ankle. Upon examination, Dr. Urkowitz stated that plaintiff's "left lower leg showed multiple contusions and areas of bruising." He also stated that plaintiff had minimal swelling in her leg and significant pain in her ankle, which was bruised, swollen, and had a decreased range of motion. Dr. Urkowitz concluded by stating that Phillips had "a lower left leg contusion with excoriation" and a left ankle sprain. He prescribed *309 Motrin for the pain and advised Phillips to apply ice, rest the leg in an elevated position, and continue with an ace wrap.
On August 14, 1989, Phillips revisited Dr. Urkowitz. Her leg and ankle were improving and her pain subsided. Dr. Urkowitz reiterated his previous assessment and continued the course of treatment except that he had Phillips apply heat to her leg and ankle instead of ice.
Dr. Urkowitz stated that Phillips' left leg contusion had healed and on August 28, 1989, her left ankle sprain was improving. He advised Phillips to continue applying heat to the ankle, taking Motrin, and to have the ankle X-rayed in a week. What's more, the doctor said she could return to work full time.
Phillips returned to Dr. Urkowitz on September 11, 1989. She complained of neck and jaw numbness over the previous five to six days and some neck pain. Further, her cervical spine was mildly tender and her range of neck motion was limited to 75 degrees. Her ankle, however, was no longer tender and had a full range of motion. The doctor considered her as having a healing left ankle sprain, healed leg contusion and a cervical sprain and strain injury. The doctor advised her to continue the course of treatment and have a cervical spine X-ray.
On September 25, 1989, Phillips complained of a muscle spasm and "some bilateral hand weakness if she holds objects for long periods of time" as well as neck pain. The cervical spine X-ray revealed some degenerative arthritis and some narrowing of the canal through which the nerves travel. Dr. Urkowitz told her to continue with Motrin and heat treatments and prescribed Valium for the muscle spasm. She began a course of physical therapy consisting of hot packs and ultrasound therapy to her neck three times per week for two weeks.
On October 11, 1989, Phillips returned to Dr. Urkowitz with much less neck pain and a fuller range of motion. The doctor assessed her as suffering from "cervical sprain and strain, resolving and degenerative arthritis." Dr. Urkowitz discharged Phillips *310 from his care and told her she could continue with Motrin and heat as needed.
In a February 25, 1990 letter to plaintiff's attorney, Dr. Urkowitz explained that he discharged Phillips on October 11, 1989, with instructions that "she may return to our office for follow-up at any time. Ms. Phillips has not returned for any follow-up office visits." In a March 26, 1991 report, after "a final follow-up visit" on March 4, he wrote the attorney:
Mrs. Phillips returned to my office for a final follow-up visit on March 4, 1991. Mrs. Phillips states she was still having intermittent bilateral shoulder pain as well as left foot pain and low back pain. She states that this pain has been going on since the accident, occurring intermittently and with varying severity. Her physical exam on that day revealed her cervical spine to be nontender. She did have some mild paravertebral muscle spasm. Her neck had full range of motion, and her neurologic exam was intact. Her thoracic spine was nontender, and her lumbosacral spine was mildly tender. There was additionally paravertebral muscle spasm and full range of motion. Her neurologic exam revealed her deep tendon reflexes to be 2/4 bilaterally and equal.
Her left ankle was tender to lateral palpation, and it did have decreased range of motion and increased pain with inversion of the ankle.
My assessment at this time is that of a chronic cervical, thoracic, and lumbar strain and sprain as well as a chronic left ankle sprain, which I feel is directly related to her motor vehicle accident of August 6, 1989.
I advised Mrs. Phillips to continue to use heat, rest, and Advil as necessary and gave her some neck and low back exercises and asked her to return to the office at any point if her symptoms should increase.
It is my opinion that these injuries are going to be of a chronic, intermittent nature, leaving Mrs. Phillips with a degree of permanent, although intermittent, disability.
On April 25, 1990, Phillips saw Dr. Gleimer, an orthopedist, who found "moderate myospasm and palpatory discomfort in the cervical [and lumbar] spine." He reported her range of motion in the cervicothoracic spine as 75% of normal, 80% of normal in the lumbar spine, and that tendon reflexes, strength, and sensation were normal in the upper extremities. He stated that Phillips suffered from "[c]hronic post-traumatic cervical and thoracic and lumbar strain and sprain with myofascitis. Chronic sprain, left lateral ankle and foot." He further opined that Phillips would continue to have pain with exertional stress and position to her neck, mid and lower back and left ankle "to some degree on a *311 permanent basis." The physician also noted that Phillips' shoulder symptoms have been due in part "to traumatically induced carpel tunnel syndrome." He made no reference to any prior history relating to this syndrome.
Phillips apparently did not return to Dr. Gleimer for at least one year, as indicated by an August 7, 1991 report, which states that she was returning after "a year's hiatus for re-evaluation" because of neck and low back pain as well as stiffness, hand paresthesia[5] and ankle discomfort. Dr. Gleimer also noted chronic tendinitis and left ankle sprain, chronic cervical and lumbar strain and bilateral carpal tunnel syndrome, the latter progressing to where she had muscle atrophy and weakness. She revisited Dr. Gleimer on September 4, 1991. At that time, he indicated that her carpal tunnel syndrome was moderate to severe in both her wrists and recommended decompression. He again described the cervical and low back injuries as "chronic and permanent in nature." In an October 9, 1991 letter to Dr. Urkowitz' group, Dr. Gleimer refers to Phillips' "carpal tunnel symptomatology" and opines it "is a result of her prior motor vehicle accident."
On April 2, 1992, at the request of her P.I.P. carrier, Dr. Jani examined Phillips. In his report, Dr. Jani noted that Phillips suffered from arteriosclerotic cardiovascular disease and had undergone five cardiac bypass surgeries. He further noted she had experienced numbness and pain in both hands for over ten years. In his opinion, she suffered "mild musculotendinous and ligamentous injuries to the neck and cervical spine, thoracolumbar spine and the left ankle in the accident...." There was no stiffness or spasm in the neck or thoracic spine. He also opined that she needed no further treatment and the carpal tunnel syndrome was pre-existent.
*312 Phillips returned to Dr. Gleimer on April 29, 1992, with complaints of continued pain in her left ankle and intermittent problems with her neck and low back. Gleimer indicated in his report that she suffered from "[c]hronic cervical and lumbar strain and sprain with myofascitis" and "chronic tendinitis and neuritis left lower extremity  left foot and ankle." He tentatively discharged her at that time but thought she would ultimately require surgical decompression for her carpal tunnel syndrome.
A May 4, 1978 "Report of Nerve Conduction Studies and Electromyography," which describes tests performed on Phillips, states she had "[s]ensory and motor nerve conduction slow" in both wrists. What's more, the report noted complaints of aches and numbness in the left hand for five to six years before that.
After the accident, plaintiff missed work for three weeks (August 7 to August 29, 1989) and, apparently, lost overtime. She returned, however, to her full-time duties after three weeks and eventually worked up to fifty hours per week. As for household chores, Phillips stated she did most of the cooking, laundry, and dusting, but her husband did the vacuuming, some cleaning, and took out the garbage.
In a November 9, 1992 certification, plaintiff described the effects of the accident on her day-to-day life:
A. I experience pain and stiffness in my left ankle which seems to be dependent on my level of activity. Due to the pain and discomfort in the ankle, I am unable to stand or walk for long periods of time without pain.
B. I experience a tightness and achiness across my shoulder area when I attempt to use or move my arms and shoulders or when I remain in one position for an extended period of time. It feels like the muscles are tight and in knots. I do not have the ability to use my arms and shoulders without pain and discomfort as I did before the accident.
C. I have pain, numbness and tingling sensations which go from my left wrist down into the hand. This has been ongoing and continuous since the motor vehicle accident. Additionally, my grip in the left hand is definitely weaker than it was before the accident.
D. I regularly experience difficulty in getting to sleep due to the pain and achiness in my neck and shoulder region.

*313 E. It is very difficult and painful for me to do very simple things such as driving or simply staying in any position for a reasonable period of time as I become very stiff and must get up and move around.
F. Virtually all types of physical and leisure activities are now restricted. There are some physical activities that I am simply unable to do and others which can only be done with pain.
G. Before the accident, I used to crochet on a regular basis. I can no longer perform this activity because of the numbness and weakness in my left hand and the pain I experience in the shoulder region from sitting in one position.
H. My husband and I used to enjoy going to flea markets on a regular basis. We can no longer do this because I can not walk for an extended period of time without pain in the left ankle.
I. Before this accident I used to enjoy baking on a regular basis. Now, I simply do not have the strength to do the lifting and opening of ingredients that is required when baking.
The motion judge ruled that Phillips failed to meet the verbal threshold, based upon Oswin, because she failed to present credible and objective medical evidence that would place her injury into one of the nine exceptions. He commented:
The Oswin court has made clear, and it is the case, that there may be some alteration of customary activities, but that does not meet the standard, and the Court finds that reduction in her baking past time or less frequent visitation of flea markets would not constitute a restriction under type nine type of injury under the statute and are so incidental that under the intent of the legislature in enacting the statute they're not the type of loss of function which would provide for recovery, nor would the alteration in the house cleaning activities that have been certified to in the certifications.
The motion judge concluded that Phillips' evidence of limited range of motion and tenderness of tissue injuries was not enough to overcome the verbal threshold. He also found that plaintiff's carpal tunnel syndrome was preexisting, and said:
The Court finds from the evidence contained in the medical certifications that the carpal tunnel syndrome referred to was a preexisting condition, and there is no tangible credible objective evidence linking any change of condition or pain or restriction in use under that condition connected with the injury and accident which is the subject of this litigation. In fact, two doctors stated that the symptomatology was the result of [a] prior motor vehicle accident. That is to say Dr. Gleimer, Barry Gleimer, in his letter of October 9, 1991 stated . .. to ... Doctors Wikler (phonetic), Leshner and DeBona (phonetic), Urkowitz and Dear, "That is my opinion that her carpal tunnel symptomatology is a result of her prior motor vehicle accident."

*314 Similarly, Dr. Devendra Jani in his report of April 2, 1992, to Selective Insurance Company of America, stated, "Impression bilateral carpal tunnel syndrome preexistent."
Dr. Gleimer's reference to a prior motor vehicle accident appears to have been misconstrued as there is nothing in the record about any other accident. We therefore read the comment as referring to the August 1989 accident. It is undisputed, however, that the carpal tunnel condition was preexisting. Further, there is nothing in the record to establish any exacerbation or aggravation of such a condition as opposed to progression of the condition over the years.
Phillips also contended that her injuries qualify as either a type six or seven disability, i.e., "permanent loss of use of a body organ, member, function or system" or "permanent consequential limitation of use of a body organ or member." The motion judge noted Oswin's admonition that mere parroting of the term "permanent" is not enough to satisfy the statute. He held that it was not enough that Phillips suffer "some limitation or some pain or even some loss of motion or use," and even if these factors in the wrist and/or arm of plaintiff were enough to show permanence, this was not enough to cross the verbal threshold because there was no objective evidence that this was linked to the accident.
The judge said:
The report of Dr. Urkowitz, one of which was issued on February 25th, 1990, stated that after remedial treatment for left ankle pain, and Ms. Phillips, the plaintiff, reported at an early date that her ankle was improving and that she was having less pain, and that as to her stated neck pain, again, on October 11th, 1989 she reported feeling much better, undergoing two weeks of physical therapy, having much less pain and better range of motion. There was minimal muscle spasm. She had full range of motion according to that report. And, he reported he discharged her from medical care for her automobile accident and that she was instructed she could follow-up with return visits to the office, but did not at that time.
His report, also, at that date, showed that on August 28, 1989 there was some tenderness over the lateral ankle. She had full range of motion. As this Court has stated earlier, tenderness to a member or tenderness in general is not enough to be of the type that the legislature contemplated in enacting the statute.
In summary, examining all the sections of the Verbal Threshold Statute and the claimed injuries of this plaintiff who was allegedly involved in an automobile *315 accident and who's expressed and experienced disabilities and discomforts connected with that accident, this Court in examining all the medical records and reports issue [sic] by both and filed by both plaintiff and defendants find that utilizing the standard, all the standards set forth in the case of Oswin versus Shaw that like that case this plaintiff has not adequately supported a claim for relief under the Verbal Threshold Statute.
The expressions of tenderness, the limitations of range of motion tests are not adequate to supply that  support that claim. And, in using the test that there must be objective proof of injury and disability under the categories of injury that I have recited, I find that this case with this particular plaintiff does not contain those adequate claims for relief under the statute. Obviously no death. I find there's no dismemberment. No significant disfigurements have been alleged, no fracture, no loss of a fetus, no permanent loss of use of a body organ member, function or system connected with this incident in this litigation and no permanent consequential limitation of use of a body organ or member neither to the back, the neck or the ankle and not the wrist and arms which are not the subject of this litigation this Court finds.
There's no significant limitation of a use of a body function or system, and the Court has already determined that there is not an impairment of a nonpermanent nature preventing the plaintiff from performing substantially all of the material acts which constitute her usual and customary daily activities which, of course, include making a living, following her occupation, having household and marital duties and being able to walk about and be mobile.
For all of those reasons this Court will at this time grant the motion for summary judgment brought by the defendant and will dismiss the complaint as to the defendant.
We essentially agree with the trial judge's decision. At the time of the accident, the following provision of the New Jersey Automobile Reparation Reform Act applied:
[N.J.S.A.] 39:6A-8. Tort exemption; limitation on the right to noneconomic loss

One of the following two tort options shall be elected, in accordance with section 14.1 of P.L. 1983, c. 362 (C. 39:6A-8.1), by any named insured required to maintain personal injury protection coverage pursuant to section 4 of P.L. 1972, c. 70 (C. 39:6A-4),
a. Every owner, registrant, operator or occupant of an automobile to which section 4 of P.L. 1972, c. 70 (C. 39:6A-4) personal injury protection coverage, regardless of fault, applies, and every person or organization legally responsible for his acts or omissions, is hereby exempted from tort liability for noneconomic loss to a person who is subject to this subsection and who is either a person who is required to maintain the coverage mandated by this act, or is a person who has a right to receive benefits under section 4 of P.L. 1972, c. 70 (C.39:6A-4), as a result of bodily injury, arising out of the ownership, operation, maintenance or use of such automobile in this State, unless that person has sustained a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; *316 permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute that person's usual and customary daily activities for not less than 90 days during the 180 days immediately following the occurrence of the injury or impairment; ...
* * * * * * * *
The tort option provisions of subsection a. of this section shall also apply to any person subject to section 14 of P.L. 1985, c. 520 (C. 39:6A-4.5).
Persons who choose the "verbal threshold" enjoy lower insurance premiums in exchange for their choice of foregoing the unlimited right to seek recovery for noneconomic losses in an automobile accident. Oswin, supra (129 N.J. at 297, 609 A.2d 415). Recovery under the verbal threshold option is allowed only for injuries that fit at least one of the nine categories specified in subsection 8(a) quoted above. See also Oswin, supra (129 N.J. at 297, 609 A.2d 415).
In Oswin, the Court held that on motions for summary judgment involving verbal threshold issues, "plaintiff must show a material dispute of fact by credible, objective medical evidence." Id., at 314, 609 A.2d 415. Further, as noted in Oswin, parroting of the words of the statute is not of assistance to the court in analyzing whether a plaintiff has carried his or her burden. Id., at 320, 609 A.2d 415. Rather, the treating physician's reports must be scrutinized for "objective proof of ... injury and consequent disability." Id., at 319-320, 609 A.2d 415. Indeed, even limitations in range of motion are insufficient "unless the restricted mobility is verified by physical examination and observation." Id., at 320, 609 A.2d 415.
It is indeed clear that Phillips had a preexisting carpal tunnel syndrome condition and suffered from arteriosclerotic cardiovascular disease for which she had undergone five cardiac bypass surgeries. Although Dr. Gleimer's reports, and at some points Dr. Urkowitz' reports, attempt to fit Phillips' injuries under type six or seven, we agree with the trial judge that plaintiff's case fails to meet the appropriate criteria.
*317 In support of her argument that the judge erred in granting defendant's motion for summary judgment, plaintiff relies on language in Oswin discussing the criteria for summary judgment motions and indicating that factual disputes are to be resolved by a jury: "[O]nce a court determines that evidence bearing on a plaintiff's injuries could, if believed by the factfinder, satisfy the statutory verbal threshold requirement, any disputed issues regarding the nature and extent of those injuries must be decided by the jury." Oswin, supra (129 N.J. at 313, 609 A.2d 415). Phillips argues that there was a genuine issue of material fact regarding the permanency of her injuries. Plaintiff, as the party opposing this summary judgment motion, receives the benefit of reasonable inferences. Thus, we can consider the documents and materials submitted by Phillips, and even disregard defendants' documents to the extent inconsistent or disputed. Even doing so, however, plaintiff's injuries fail to fall within any of the nine recognized exceptions.
We have carefully reviewed the record and the trial judge's determination in light of Oswin and conclude that there is no warrant for our intervention. Plaintiff has failed to submit objective medical evidence to support a finding that her injuries fall within one of the categories in N.J.S.A. 39:6A-8(a), particularly types six, seven or eight. Merely because a doctor claims that his findings are based on "objective" testing does not transform such findings into credible, objective medical evidence. Nor do we find a material dispute of facts warranting plenary disposition. Oswin, supra (129 N.J. at 322, 609 A.2d 415); Cf. Dabal v. Sodora, 260 N.J. Super. 397, 399-401, 616 A.2d 1297 (App.Div. 1992).
Even assuming Phillips produced credible, objective medical evidence of her injuries, it is clear that the judge correctly held that the injuries did not have a serious impact upon plaintiff. Under Oswin, plaintiff has the burden to establish that the injuries "`had a serious impact on the plaintiff and her life'" with "resultant loss and disability." Id., at 318, 609 A.2d 415 (quoting Oswin v. Shaw, 250 N.J. Super. 461, 470, 595 A.2d 522 (App.Div. *318 1991)). Mere "`subjective complaints unsupported by credible medical evidence do not suffice.'" Ibid. It is not enough for Phillips to produce credible, objective medical evidence of injury; she must also establish resultant loss and disability having a nexus to that injury. Oswin, supra (129 N.J. at 318, 609 A.2d 415).
Phillips also fails to meet the threshold burden of showing a type eight injury, i.e., a "significant limitation of use of a body function or system." N.J.S.A. 39:6A-8(a); Oswin, supra (129 N.J. at 316, 609 A.2d 415). Dr. Gleimer's report attempted to fit Phillips' injuries under type eight, as did Phillips' certification but, as recognized in Oswin, the mere parroting of words will not elevate plaintiff's injuries beyond the verbal threshold.
Phillips only lost three weeks from work and was able to return to full-time duties and even worked overtime. She also appears to have been able to do most of her household duties. The comparatively small limitations on her range of motion, which have improved since the accident, do not establish that her life has been significantly or seriously impacted within the contemplation of the verbal threshold statute.
We concur with the motion judge that as a matter of law these were not such "serious" injuries within the intent of the verbal threshold statute to carry Phillips across the statutory threshold.
In light of our decision we need not review at length the New York decisions relied upon by plaintiff. We view them as distinguishable or inapposite here. It is sufficient to note that as to those New York cases that intimate that pain alone might form the basis of a serious injury within the meaning of the verbal threshold law, thereby creating an issue of fact for a jury,[6] appear to run contrary to Oswin (129 N.J. at 319, 609 A.2d 415). Plaintiff's statements of pain during her course of treatment would not constitute credible, objective medical evidence to avoid the threshold.
*319 Phillips also argues that allowing the out-of-state defendants (Carrigans) to assert this verbal threshold violates her constitutional rights, although she does not indicate precisely what rights these are. She asserts that there is no legitimate state interest in protecting out-of-state drivers who come into New Jersey and that the law was only designed to regulate the relationship between New Jersey citizens. Plaintiff's vague constitutional challenge seems to be that she is somehow deprived of her due process rights by legislative proscription to sue an out-of-state person because she claims the State has no legitimate interest in preventing the suit.
This argument is without merit. Defendants may rely on the verbal threshold provision of an in-state plaintiff's policy. N.J.S.A. 17:28-1.4 provides:
Any insurer authorized to transact or transacting automobile or motor vehicle insurance business in this State, or controlling or controlled by, or under common control by, or with, an insurer authorized to transact or transacting insurance business in this State, which sells a policy providing automobile or motor vehicle liability insurance coverage, or any similar coverage, in any other state or in any province of Canada, shall include in each policy coverage to satisfy at least the liability insurance requirements of section 1 of P.L. 1972, c. 197 (C. 39:6B-1) or section 3 of P.L. 1972, c. 70 (C. 39:6A-3), the uninsured motorist insurance requirements of subsection a. of section 2 of P.L. 1968, c. 385 (C. 17:28-1.1), and personal injury protection benefits coverage pursuant to section 4 of P.L. 1972, c. 70 (C. 39:6A-4) or of section 19 of P.L. 1983, c. 362 (C. 17:28-1.3), whenever the automobile or motor vehicle insured under the policy is used or operated in this State.
Any liability insurance policy subject to this section shall be construed as providing the coverage required herein, and any named insured, and any immediate family member as defined in section 14.1 of P.L. 1983, c. 362 (C. 39:6A-8.1), under that policy, shall be subject to the tort option specified in subsection a. of section 8 of P.L. 1972, c. 70 (C. 39:6A-8).
Defendants' policy is thus to be construed as providing the coverage of a policy issued in accordance with New Jersey law. Defendants are thus entitled to the protections of the verbal threshold statute. The interests identified in Oswin as to N.J.S.A. 39:6A-8 apply here as well. The statutes serve to reduce the number of suits in New Jersey and thus contribute to lower premiums. See Oswin, supra (129 N.J. at 318, 609 A.2d 415).
*320 Plaintiff additionally attempts to raise due process and equal protection arguments. She refers to N.J.S.A. 39:6A-8.1, which requires the election of either option under N.J.S.A. 39:6A-8 to be "in writing and signed by named insured on the coverage selection form...." If the named insured does not so elect any of the tort options "the named insured shall be deemed to elect the tort option of subsection a. of that section 8," i.e., with the verbal threshold. Plaintiff argues that a classification is drawn by the statute between those who can afford coverage, and hence, can maintain a law suit, and those who cannot and are forced to choose the threshold option or are deemed to if they do not elect otherwise in writing. Such a classification, she argues, is subject to equal protection standards. Plaintiff also contends that substantive due process rights are violated because this provision bears no rational relationship to a legitimate state objective.
Plaintiff makes no allegation that either a suspect class or a fundamental right is involved. Hence, under equal protection analysis, the classification need only show a rational relation to a legitimate state objective. Barone v. Department of Human Services, 107 N.J. 355, 365, 526 A.2d 1055 (1987); Murphy v. Allstate Ins. Co., 252 N.J. Super. 280, 285, 599 A.2d 916 (App.Div. 1991); Watkins v. Davis, 259 N.J. Super. 482, 489, 614 A.2d 189 (Law Div. 1992). The rational relationship test also applies in due process analysis where there is no fundamental right involved. See Chamber of Commerce of U.S. v. State, 89 N.J. 131, 155, 445 A.2d 353 (1982); Robson v. Rodriguez, 26 N.J. 517, 522, 141 A.2d 1 (1958).
We conclude that the verbal threshold option in the statute bears a rational relation to a legitimate state objective. A legitimate state interest exists in allowing those who choose to pay higher premiums to opt out of the verbal threshold. For obvious reasons, the Legislature may protect the people of the state from financial hardships by ensuring an opportunity to seek redress in court for injuries sustained in automobile accidents while still reducing the overall number of such suits and the consequent *321 higher premiums that result from insurers having to pay verdicts and settlements. Those who pay higher premiums presumably offset the amount insurance companies might have to raise premiums overall. Allowing those who desire to have the opportunity to sue by paying higher premiums is thus rationally related to a legitimate state objective.
Phillips also contends the verbal threshold law is vague and violates the mandate "that a law be sufficiently clear and precise so that people are given fair notice and adequate warning of the law's reach." Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n. 21, 462 A.2d 573 (1983). This principle applies to civil as well as criminal statutes. Giaccio v. Pennsylvania, 382 U.S. 399, 402, 86 S.Ct. 518, 520, 15 L.Ed.2d 447, 450 (1966); Leonen v. Johns-Manville Corp., 717 F. Supp. 272, 279 (D.N.J. 1989). A law is vague if "it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." Giaccio, supra 382 U.S. at 402-403, 86 S.Ct. at 520-521, 15 L.Ed.2d at 450).
Plaintiff claims the statute is vague when it allows persons who choose the verbal threshold to recover if among other reasons they make some showing of:
permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system;
Where the terms of a statute are not difficult to understand and interpret when they are given their ordinary meaning, they cannot be said to be vague for constitutional purposes. Matter of C.V.S. Pharmacy, Wayne, 116 N.J. 490, 501, 561 A.2d 1160 (1989), cert. denied, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990). We reject plaintiff's argument. The statute cannot be termed vague under that standard. Phillips v. Curiale, 128 N.J. 608, 618, 608 A.2d 895 (1992) ("If the language is plain and clearly reveals the statute's meaning, the court's sole function is to enforce the statute in accordance with those terms.").
*322 As previously noted, plaintiff claimed certain uncompensated economic losses such as the PIP deductible and co-payment. As we recently stated, however, in Roig v. Kelsey, 262 N.J. Super. 579, 587, 621 A.2d 540 (App.Div.), certif. granted, 133 N.J. 445, 627 A.2d 1149 (1993):
If the injured person is not able to sue under N.J.S.A. 39:6A-8 because of failure to meet the threshold applicable to the type of coverage he or she has, then such injured person cannot sue to recover unpaid medical and co-payments under N.J.S.A. 39:6A-12.
Moreover, we think the language in the second paragraph of 39:6A-12 (directing the court to instruct the jury that `in arriving at a verdict as to the amount of the damages for noneconomic loss to be recovered by the injured person, the jury shall not speculate as to the amount of the medical expense benefits paid or payable....') reinforces the Legislative intent that Section 12 applies only in the event an injured person may bring suit under N.J.S.A. 39:6A-8. We believe this construction is consistent with the entire mosaic of the No-Fault statute and will not add to the number of lawsuits filed, but will only add to the amount of the claim against the tortfeasor.
Accordingly, plaintiff's claims for economic loss are properly dismissed.
Affirmed.
NOTES
[1] Reference to Phillips alone refers to plaintiff unless otherwise indicated.
[2] On February 19, 1993, the motion judge informed the parties' attorneys that he was issuing "an amended correction Order on March 1, 1993," unless he heard a meritorious objection, to correct the dismissal of the entire complaint instead of just the claims for noneconomic damages. The trial judge never issued such order.

On March 5, 1993, we granted plaintiff's motion to file a notice of appeal from the December 4, 1992 order nunc pro tunc.
[3] The complaint incorrectly states August 6, 1990.
[4] Nationwide Insurance Co., through its subsidiary Wausau Insurance Co., insured Carrigan's vehicle.
[5] Paresthesia is defined as "[s]ensation of numbness, prickling, or tingling; heightened sensitivity." Taber's Cyclopedic Medical Dictionary 1332 (16th ed. 1989).
[6] See, e.g., Hourigan v. McGarry, 106 A.D.2d 845, 484 N.Y.S.2d 243, 244 (1984).